Argued July 10, modified and remanded September 10, 1973

SHIELDS ET AL, *Respondents, v.*
DEPARTMENT OF REVENUE, *Appellant.*
513 P2d 784

*Alfred B. Thomas,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were Lee Johnson, Attorney General, and Theodore W. deLooze, Chief Tax Counsel, Salem.

*Vernon D. Gleaves,* Eugene, argued the cause for respondents. With him on the brief were Thomas M. Allen, and Butler, Husk & Gleaves, Eugene.

Before O'CONNELL, Chief Justice, and McALLISTER,* DENECKE, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

HOWELL, J.

This appeal by the defendant, Department of Revenue, is from an adverse decision of the Tax Court in which the method of valuation of improvements and their assessability to the plaintiffs were in issue. The land itself is not involved in this appeal as the parties have agreed upon its value.

Plaintiffs are copartners and owners of a large regional shopping center in the city of Eugene. As of the assessment date, January 1, 1970, the plaintiffs had entered into approximately 50 leases with various

---

* McAllister, J., did not participate in this decision.

tenants for business space in the shopping center. Most of the leases were "shell and allowance" leases whereby the plaintiffs constructed only the building shell and the tenant constructed the interior of the premises. Under this type of lease the plaintiffs, as landlords, paid the tenant a specific dollar allowance in partial reimbursement to the tenant for his expenses in completing the interior of the store. In the other leases the plaintiffs completed the entire structure and delivered it to the tenant, who then had only to install his trade fixtures. Our only concern is with the former type of lease.

Only two issues are presented: (1) Is the cost approach or the income approach to market value the proper method of valuation of plaintiffs' buildings, and (2) Are the tenants' improvements over and above the plaintiffs' allowances assessable to plaintiffs as owners, or to the tenants?

In approaching the problem of valuation of plaintiffs' buildings, both parties agreed that no sales of comparable properties were available. The county assessor and the Department of Revenue relied on the income approach. The plaintiffs argued for the cost approach and contended that the income approach was improper under the circumstances because the shopping center was so new that its income and operating expenses had not yet become stabilized.

The Tax Court found that the income approach was "grossly premature" and should not have been used to determine market value. The Tax Court also found that the tenants' improvements should be assessed to the tenants. Defendant appeals.

■ Regarding the valuation issue, we agree with

and adopt the following from the unpublished opinion of the Tax Court:

"The true cash value of the property must be established as of January 1, 1970, pursuant to ORS 308.210, in accordance with the Department of Revenue Regulation R308.205-(A). The uncontradicted testimony shows that Valley River Center, on January 1, 1970, was a regional shopping center with an enclosed mall, situated on approximately 17 acres of land in Lane County, Oregon; that the first shopping center stores opened in August 1969 and others opened between that date and December 31, 1969; that the Meier & Frank store situated at the southerly end of the shopping center complex opened in August 1969 and the J. C. Penney store located on the northerly portion of the shopping center complex opened in January 1970; that a considerable amount of space owned by the plaintiffs was not leased on January 1, 1970, although a nationally known leasing agent had been seeking leases for all space owned by plaintiffs since September 1, 1967; that no other regional shopping center existed on January 1, 1970, in an area as small as the Eugene-Springfield metropolitan area; that economic conditions were depressed in the area; that lending rates were at an all-time high; that no comparable sales of similar properties were available for comparison purposes in making an appraisal; that no proven income or expense figures were available for the Valley River Center and the only proved figures available on January 1, 1970, were the actual costs and expenses incurred by the plaintiffs in the construction of the improvements as the same existed on January 1, 1970, plus the operating and expense figures for the last four months of the year 1969 during which the center had been in operation.

"The experienced appraiser who testified on behalf of defendant relied wholly on the income approach. The difficulties he experienced in so doing are easily understood because, under the facts of

this case, it is clear that the choice of method was grossly premature.

"The court finds helpful and persuasive the text of Friedman, ed, *supra* [Encyclopedia of Real Estate Appraising] at 410-411:

'After the shopping center has been constructed and in operation for two or three years, it has a record of experience in which rents on minimum guarantees are known facts as well as rents on percentage leases based on actual sales of the stores for the first two years, and facts on actual construction costs, interest and amortization on mortgages, and operating expenses. The appraisal can now be made on the basis of the total rental income, including overages on percentage leases and rentals on minimum guarantees. * * *'

This need for experience was also emphasized by the expert appraiser for the plaintiffs, based on an extensive knowledge of shopping centers (which, in the case of the regional suburban shopping center, involve unique aspects of property valuation. See Friedman, ed, *supra,* at 402, et seq.) The property improvements could not sell on the market for amounts greater than construction costs because 'it [the center] had not proven itself.'

"The income approach (an extremely useful tool in the proper situation) requires substantial amounts of particularized, verified data. Gross errors can result if such data are not available. *Feves v. Dept. of Revenue,* 4 OTR 302 (1971); *Nepom v. Dept. of Revenue,* 4 OTR 531 (1971). It was impossible for the defendant to obtain the necessary information on which to base an income approach at the required time for assessment purposes in this instance. Since the Valley River Center was unique, the assessor could not obtain data of economic rentals through other local sources, as was possible in the case of *Multnomah County v. Dept. of Rev.,* 4 OTR 383 (1971), which involved a

newly constructed high-rise apartment complex. The use of averages of data found in 'The Dollars and Cents of Shopping Centers, 1969,' referred to by both sides, is not to be relied on if better data can be found.

"The plaintiffs' testimony as to its construction costs was detailed and accurate. The testimony of the witnesses completely overcame the suggestion of the defendant that, since one partner supplied the steel used for construction and another did the construction work and was paid to supervise it, these transactions could not be considered as 'arm's length' and representative of the market. The plaintiffs had carefully segregated from their construction costs as of January 1, 1970, those which were applicable to work done after that date.

"The court finds that the most acceptable approach to value in these circumstances is the cost approach, used by the plaintiffs. The preponderance of the evidence supports a value for the improvements of $3,751,736, as of January 1, 1970."

The second issue is whether the tenant's improvements in excess of the allowance granted by plaintiffs are assessable to plaintiffs as owners of the buildings, or to the tenant.

The authority to separately assess improvements on real property based on ownership of the improvement is found in ORS 308.115 (2) which states:

"(2) Similarly, whenever any building, structure, improvement, machinery, equipment or fixture is owned separately and apart from the land or real property whereon it stands or to which it is affixed, such building, structure, improvement, machinery, equipment or fixture shall be assessed and taxed in the name of the owner thereof."

The lease, which is more than 50 pages in length, makes various references, some of which are ambig-

uous, to the various rights and obligations of the tenant regarding the tenant's improvements.

Article 1 B, "Possession of Premises," states in pertinent part:

"B. *Surrender of Premises*:

"Upon the expiration or sooner termination of the term of this Lease \* \* \* and if Tenant has fully and faithfully performed all of the terms, conditions and covenants of this Lease to be performed by Tenant, \* \* \* *Tenant shall,* \* \* \* *remove its signs and all of its movable trade fixtures and equipment (all of which are hereinafter referred to as 'Tenant's Property') from the Premises* \* \* \*. If Tenant has not fully and faithfully performed all of the terms \* \* \*, Tenant shall nevertheless remove Tenant's Property from the Premises in the manner aforesaid within fifteen (15) days after receipt of written direction to do so from Landlord. *Tenant shall remove the floor coverings, lighting fixtures and other similar removable items Tenant has affixed to the Premises only if directed in writing to do so by Landlord* in which event it shall do so, \* \* \*. In the event Tenant shall fail to remove any of Tenant's Property, floor coverings, lighting fixtures and other items Tenant has affixed to the Premises as provided herein, Landlord may, but is not obligated to, at Tenant's expense, remove all of Tenant's Property, floor coverings, lighting fixtures and other items Tenant has affixed to the Premises not so removed and repair all damage to the Premises resulting from such removal and may, but is not obligated to, at Tenant's expense store the same in any public or private warehouse, \* \* \*." (Emphasis supplied)

The above article defines different types of property, and these terms are used in that sense in other portions of the lease. Tenant's Property is defined as signs, movable trade fixtures, and equipment.

Such property belongs to the tenant and must be removed at the termination of the lease. Another category of property is floor coverings, lighting fixtures "and other similar removable items Tenant has affixed to the premises." Property in this category apparently belongs to the landlord but may be removed by the tenant. We conclude from the briefs that "Tenant's Property" and the other property referred to as floor coverings, etc., are not involved in this proceeding.

The dispute here is focused on property described in the lease as "Tenant's Work" and which is not mentioned in Article 1 B above relating to ownership and removal of Tenant's Property and lighting fixtures, etc. "Tenant's Work" described in Division 4 of Exhibit D to the lease constitutes those improvements made by the tenant over and above the allowance granted by the landlord for expenses incurred by the tenant in the "shell and allowance" lease. "Tenant's Work" includes such items as ceilings, plumbing, heating and air conditioning equipment, and electrical wiring.

Clause 6 of the lease relating to Tenant's Work states that such work "shall be deemed to be the personal property of Tenant irrespective that such work becomes affixed and/or attached to the demised premises." Plaintiffs contend that this clause should be read literally so as to conclusively vest ownership in the tenant during the term of the lease and therefore relieve plaintiffs of any obligation to pay taxes on this property. However, we believe that Clause 6 above must be read in conjunction with Article 8 A of the lease relating to personal property taxes. That article states:

"A. *Personal Property Taxes*:
  "*Tenant shall be liable for and shall pay before*

*delinquency \* \* \* all taxes and assessments of whatsoever kind or nature \* \* \* levied against Tenant's Property and any other personal property of whatsoever kind and to whomsoever belonging situate or installed in and upon the Premises, whether or not affixed to the realty, excluding all items installed as Tenant's Work under the provisions of Exhibit 'D' attached hereto to the extent of the allowance provided in Article 45 hereof,* and items installed by Landlord as Landlord's Work under the provisions of said Exhibit 'D'. If at any time during the term hereof any of said property, whether or not belonging to Tenant, shall be taxed or assessed as part of the real property on which the Premises are situate, then such taxes or assessments shall, for the purpose of this Lease, be deemed to be personal property taxes or assessments and the provisions of Article 8 B hereof shall not be applicable thereto \* \* \*." (Emphasis supplied)

In effect, Article 8 A above provides that the tenant is responsible for all taxes assessed against the Tenant's Property and all other personal property whether affixed to the realty or not, but excluding Tenant's Work to the extent of the amount paid by the landlord. Also, any taxes assessed against "said property" as real property are considered to be personal property assessments.

From Clause 6 which states that Tenant's Work is to be considered the personal property of the tenant, and from Article 8 A which makes the tenant responsible for all taxes assessed against personal property, we conclude that, as between the plaintiffs and the tenants, the tenants are ultimately responsible for all taxes assessed against the items included in Tenant's Work. However, this interpretation does not

decide the issue of who owns Tenant's Work for purposes of assessment under ORS 308.115 (2).

■ While the parties may agree between themselves that the various items involved in the category of Tenant's Work which are part of the realty may be considered to be personalty for tax purposes, that agreement will not control the State in the exercise of its taxing power. *Warm Sprgs. Lbr. Co. v. Tax Com.,* 217 Or 219, 225, 342 P2d 143 (1959).

Real property for purposes of taxation includes all buildings, improvements, machinery, equipment or fixtures on the land. ORS 307.010. Generally, real property is assessed as a whole in the name of the owner. An exception is where the buildings, improvements, etc., are owned separately and apart from the land, in which case ORS 308.115 (2) requires the assessor to assess and tax them separately.

■ As a general rule, in the absence of an agreement, any buildings or improvements erected by the tenant will become the property of the landlord at the termination of the lease. *Title & Trust Co. v. Durkheimer Co.,* 155 Or 427, 453, 63 P2d 909, 64 P2d 834 (1937); *Gen. Petroleum Corp. v. Schefter,* 141 Or 349, 352, 16 P2d 645 (1933); 3 Thompson on Real Property 531, 532, § 1140 (1959).

However, the parties may agree that any improvements erected by the tenant may remain the property of the tenant and be removable by him. *Gen. Petroleum Corp. v. Schefter,* supra; 51C CJS 1019, Landlord & Tenant § 394 (2) (1968); 3 Thompson, supra at 544, 546, § 1141.

■ In the instant case it is true that Clause 6 states that Tenant's Work shall be the personal property of the tenant. However, we construe Clause 6,

read in light of Article 8 A, as relating to the obligation to pay personal property taxes, and not as a contractual provision determining ownership of what would otherwise be real property.

Even if we were to construe Clause 6 making the Tenant's Work the personal property of the tenant as an ownership clause,[1] that provision alone in the lease is not conclusive of ownership. A provision in a lease that the tenant is the owner of an improvement is not conclusive, at least for tax purposes, if other indicia of ownership are not present. *National Cold Storage v. Boyland,* 16 AD2d 267, 227 NYS2d 147 (1962). Here, the lease lacks the significant feature of right to removal. As we mentioned previously, Article 1 B allows only the tenant to remove Tenant's Property (signs, movable trade fixtures, and equipment). We would conclude that the failure to include Tenant's Work as a removable item belonging to the lessee was deliberate, because it is not reasonable that the landlord would desire the tenant to remove ceilings, equipment, and wiring which are examples of items classified as Tenant's Work.

Additionally, there are other clauses in the lease which would indicate that ownership of Tenant's Work is in the landlord. Article 7 provides that any structural changes or alterations, except for trade fixtures, equipment and furnishings, become the property of the landlord. Article 10 requires the tenant to insure only Tenant's Property and its merchandise.

---

[1] In Annot., 154 ALR 1309, 1314-15 (1945), it is suggested that if a clause in a lease agreement provides that the improvement is to remain as the tenant's property, then such an agreement should be controlling. However, we are persuaded that it should not be conclusive when no other indicia of ownership are present in the agreement.

Finally, Article 14 states that any sums paid as a result of condemnation will belong to the landlord with the sole exception of that sum which represents a taking of Tenant's Property.

Modified and remanded with directions to enter a decree in accordance herewith.